## IN BANCO.

## G. MELCHERS and G. C. REINERS *vs.* WARREN GOODALE, Col. Gen. of Customs.

The court held, on appeal, that the duty of 15 per cent., imposed upon Chinese goods, by the Act of May 24th, 1853, might be levied upon such goods, when imported in a Danish vessel, without a violation of the treaty with Denmark.

This is an action brought by the plaintiffs, the firm of Melchers & Co., of Honolulu, to recover from the defendant, the Collector General of Customs, the sum of two thousand one hundred and forty-one 8-100 dollars, with interest, from the 27th day of September, 1854 ; which sum the plaintiffs aver was an overcharge of ten per cent. made by the defendant, on the duties paid by the plaintiffs at that date, under protest, on certain goods imported by them in the Danish ship " Asa Thor" from Hong Kong. The facts as set forth in the plaintiff's petition, are admitted to be true by the defendant's counsel, and the case was submitted, on those facts, to the decision of the court.

The case was argued before JUDGE ROBERTSON, acting Chief Justice at the April Term of 1855, who gave his judgment in favor of the plaintiffs, and from his decision appeal is now taken to the full Bench.

CHIEF JUSTICE LEE delivered the decision of the court as follows :

On the 19th of October, 1846, the Hawaiian and Danish Governments entered into a convention of friendship and commerce, the 7th article of which in the English version reads as follows, viz :

"ARTICLE VII. No Danish productions, or any other goods on board of, or imported in Danish ships, that can be imported by other foreign ships, shall be prohibited, nor pay more than those duties levied on goods of the most favored nation. Any alteration in the duties levied on goods, shall not take effect nor be enforced, until twelve calendar months after the first public notification of such change."

On the 24th of May, 1853, the Hawaiian Legislature enacted a law levying a duty of fifteen per cent. *ad valorem*, on all goods, wares and merchandise, imported from any port in China or the Philippine Islands, excepting only rice.

Subsequently to the passage of this act, as appears by the statement of the case, the plaintiffs imported a cargo of China goods from the port of Hong Kong, in a Danish ship, upon which the Collector General of Customs charged a duty of fifteen per cent., in accordance with the act above referred to.

The plaintiffs contend that the Act of 1853, imposing a duty of fifteen per cent. on goods imported from China, cannot affect such goods when imported in Danish ships, inasmuch as by the 7th article of the Danish Treaty above quoted, any goods imported in a Danish vessel cannot be subjected to a higher duty than that imposed on goods of the most favored nation ; and that as French goods of a like character are not subject to a higher duty than five per cent. *ad valorem*, consequently the Collector General is bound to refund the excess of ten per cent. which he has collected. There can be no question that, whenever any act of the Legislature comes in direct conflict with a

treaty, the latter must prevail and the law fall to the ground; and if we were to be guided in our decision only by the English version of the 7th article of the Danish Treaty, as given above, we have no hesitation in saying that we are unable to see how we could do other-than confirm the judgment given by the court below. But such is not the case, for we have a Danish version of the treaty, the 7th article of which is in the following words, viz :

ARTICLE VII. Ingen danske Producter eller andre Varer embord i eller indforte i danske Skibe, som ere tilladte at indfores af fremede Skibe, skulle forbydes at indfores, eiheller derfor betale mere end saadanne Toldafgifter, som i saadant Tilfœlde ere paalagte den meest begunstigede Nation. Enhver Forandring i Toldafgisterne, maa ikke fuldbyrdes eller sœttes i Kraft forend tolv Calendar Maaneder efter den forste offentlige Bekjendtgjorelse af saadan Forandring."

This is the language of the negotiator of the treaty on the part of Denmark, and must be taken to express his plain intention and understanding. A literal and critical translation of his words, as made by a scholar of undoubted ability, and confirmed by others acquainted with the Danish language, reads as follows :

" No Danish products or other goods on board of or imported in Danish vessels, which are permitted to be imported in foreign vessels shall be forbidden to be imported, nor therefore pay more than such duties as in similar circumstances are levied on the most favored nation. No change in duties may be effected or put in force before twelve calendar months after the first public notification of such change."

This careful translation of the article in Danish, throws a flood of light on the subject, and to our minds conclusively establishes the position contended for on behalf of the Hawaiian Government, namely, that it never was its intention to place Denmark on a higher footing than that of the most favored nation. The clear and obvious meaning of the article, as it reads in the Danish language is, that no Danish productions, or *any other goods*, on board of or imported in Danish ships, shall pay more than the like goods when imported in the ships of the most favored nation, under similar circumstances ; and, if instead of being confined to the English version, we had before us the translation of the article in Danish, it is hardly possible that the present controversy could have arisen. The intention of the two governments is so obvious from a reading of the article in the Danish language, that every effort to illustrate it, would only tend to perplex and confuse.

But the plaintiffs may say we choose to go by the English version of the article, which is in conflict with the Danish, and how will you reconcile them ? Our answer is, that the grand object in the interpretation of a treaty, ought to be the discovery of the intentions of the authors of that treaty, and whenever we meet with any clash or obscurity in it, we are to consider what probably were the ideas of those who drew up the convention, and to interpret it accordingly. This, says Vattel, is the general rule for all interpretations. To ascertain the intention of the negotiators of this treaty, let us inquire into the circumstances of the Hawaiian Government at the time of its execution. In 1846, his Danish Majesty's ship " Galathea" arrived at Honolulu, and her generous commander, Captain Steen Bille, see-

ing the burdens and trials under which this government was laboring in consequence of the restrictions imposed upon it by the treaties with France and Great Britain, stepped forward as our benefactor, and proposed to give us a treaty which would leave us free to regulate our commerce with foreign nations, and to enjoy the full privileges of an independent sovereignty. His object was not to impose upon us new restrictions, but to release us from those which already enchained us, and all that he asked or stipulated for was, that Danish subjects in the Sandwich Islands should enjoy the same rights and privileges as were granted to subjects of the most favored nations. His was a mission of kindness, generosity and benevolence, and would it be just or reasonable to say, that while professing to act as our benefactor, he was seeking to impose upon us new shackles ? No: and his own words show an intention the very reverse.

Again, is it reasonable to suppose that the Hawaiian Government, already chained down to the very ground by treaty stipulations, would willingly, and *unasked* submit its neck to the imposition of this new yoke ? Can it be supposed for a moment that the Hawaiian negotiator of this treaty would in his right senses, consent to give away so important a privilege, when the rights of his Sovereign were already reduced to little more than a mere shadow ? We think not; for such an interpretation of the treaty would lead to an absurdity, and it is a well settled rule of the law of nations, that every interpretation that leads to an absurdity ought to be rejected. When the expressions of a treaty are susceptible of two different meanings, we are instructed to adopt without hesitation, that meaning from which no absurdity follows; and such, in the present case, is the meaning which places Denmark on the footing of the most favored nation. Such a construction is in accordance with reason and equity, and every thing tending to place the parties on a footing of equality, is looked upon favorably by the law of nations. "The voice of equity and the general rule of contracts," says an eminent writer on this subject, require "that the conditions between the parties should be equal. We are not to presume, without very strong reasons, that one of the contracting parties intended to favor the other to his own prejudice, but there is no danger in extending what is for the common advantage. If, therefore, it happens that the contracting parties have not made known their will with sufficient clearness, and with all the necessary precision, it is certainly more conformable to equity to seek for that will in the sense most favorable to equality and the common advantage, than to suppose it in the contrary sense. For the same reason, every thing that is not for the common advantage, every thing that tends to destroy the equality of a contract, every thing that onerates only one of the parties, or that onerates the one more than the other, is odious. The party who endeavors to avoid the loss, has a better cause to support than he who aims at obtaining an advantage." Vattel's Law of Nations, p. 264, Sec. 301.

It being settled, then, that Denmark is placed by the treaty only on a parity with the most favored nation, let us inquire what are the duties legally chargeable upon goods like those imported from Hong Kong in the "Asa Thor," when imported in French ships under like circumstances; for France, in respect to duties, is the nation occupying the position most favored. To settle this question, reference must

EE

be had to the French treaty, and it is admitted by France, that Chinese goods imported in a French vessel, are subject to the duty of fifteen per cent. *ad valorem* imposed by our statute, and consequently it cannot be claimed that such goods, when imported in a Danish ship, are entitled to admission at a less rate of duty.

But, it is further contended by the plaintiffs, that though the port of Hong Kong is a port in China, it is not a Chinese port, but, on the contrary, a British port, and that under the peculiar wording of the sixth article of the French treaty, goods like these, when brought from a French possession, are not subject to a higher duty than five per cent. *ad valorem*, and by parity of right, cannot be subjected to more when brought from a British possession. The sixth article of the French treaty reads as follows :

" Les marchandises Françaises ou reconnues comme venant des possessions Françaises, ne pourront être prohibées ou soumises à un droit d'entrée plus élevé que celui de 5 per cent. *ad valorem*. Les vins, eau de vie, et autres liqueurs spiritueuses sont exceptés et pourront être soumis à tout droit équitable, dont le gouvernement des Iles Sandwich jugera convenable de les frapper, mais, à condition que ce droit ne sera jamais assez élevé pour devenir un empêchement absolu à l'importation des dits articles."

For a correct interpretation of this article we may safely resort to the views adopted by the Commissioner of France, who negotiated the treaty; for it is clearly for his interest to give it as extensive a construction as it will bear. M. Perrin, in a despatch addressed to the Minister of Foreign Relations, on the 18th of June, 1855, in reply to one from Mr. Wyllie asking his views of the duties leviable by this government, under the treaty with France, both on French merchandise, and on foreign goods imported into this kingdom in French vessels, says, that under the sixth article of the treaty with France, goods of French origin (Les marchandises Françaises) are subjected to a duty of only five per cent., from whatever country they may be imported, but, that with respect to foreign goods, this Government is left free under the treaty to impose a higher duty. In other words, that the rate of duty which this Government may levy, is to be regulated by the *origin* of the goods, and not by the port from which they may be imported. His language is as follows, viz : " According to the 6th article, France has obtained a privilege in favor of French goods, or acknowledged as coming from French possessions, *id est* in favor of goods of French origin, duly ascertained. That custom house duty has been fixed at 5 per cent. only.

" The place where goods acknowledged as proceeding from French possessions were located, ought not to interfere with the original source, French goods, which is the mother idea; the second part of the same paragraph is the consequence and the extension of the first, not at all a new sentence, including a new sense, and corresponding for instance to goods of foreign origin.

" I shall prove, in a moment, that the French government did not entertain the thought of stipulating in 1846, the extension to foreign goods of the privilege obtained in favor of French goods. A single exception has then been admitted against wine, brandy, and other liquors, of French origin, well understood, though the text is silent on that point, and that it was considered useless to repeat it.

" As a proof that the privilege consecrated by the 6th article is limited to goods of French origin, the 7th article stipulates immediately after, that the importation duties established upon goods imported by French vessels ought not to exceed those imposed upon goods from the most favored nation.

" It is evident that the framers of the treaty of 1846, have positively admitted the co-existence of two kinds of duties at the Sandwich Islands, one privileged, exclusively reserved for French goods, save one exception, the other applicable to goods of another origin, with the most favorable rate on goods imported by French vessels."

The French Commissioner interprets the words "Les marchandises Françaises ou reconnues comme venant des possessions Françaises," to read, French merchandise or goods recognized as the production of any French possession—which reading clearly excludes goods not of French origin. What can be claimed by France, the most favored nation, may equally be claimed by Denmark, but no more; and the goods imported in the " Asa Thor" not being of Danish origin, cannot claim the exemption contended for.

The decision of the court below is over-ruled, and let judgment be entered for the defendant. Under the reading of the English version of the Danish treaty, the question of the amount of duties leviable in cases like the present, was clearly open to doubt, and therefore, we think the costs of this suit, excepting only attorney's fees, should be borne by the Hawaiian Government.

————

JUDGE ROBERTSON remarked as follows.

I have but little to say in this case, farther than to express my entire concurrence in the decision of the court, as delivered by the Chief Justice. I sincerely rejoice that the court is now in the possession of sufficient light as to what were the real intentions of the negotiators of the treaty with Denmark to guide us to the judgment which has now been given. While this light has been furnished to us by the Danish version of the seventh article, a comparison of that version with the English has also made the fact still more obviously apparent than it was before, that the latter does not contain apt words to inform us as to what was the meaning and intention of the high contracting parties. A grave oversight was committed in failing to make the language of the English version to correspond as nearly as possible with that of the Danish version, because the mercantile part of the community naturally look to the former when they wish to ascertain what their rights are under the treaty.

I have a few remarks to make in reference to one point in the argument of the learned counsel for the defendant. I understood him as contending, that the principle laid down in the judgment now under review, to the effect that treaties are to be *construed* by the same rules as other instruments, is incorrect. The reason he gave in support of his argument does not seem to be at all applicable to his position, viz: that upon the principle stated by me, the treaty of 1846, between this Government and France, might be declared void by reason of one of the contracting parties having at the time acted under compulsion. Now, it appears to me that the question whether or not any given in-

strument can be held to be binding upon any party to it who pleads duress, is a widely different question from that, for instance, as to whether any given instrument can be held to be an absolute conveyance, or only a conditional one. The rules of construction have not the most remote bearing upon the former question, while in deciding the latter, they may be all important. The question raised in this case is not as to the validity of the French or Danish treaties, but merely as to the proper construction of the latter. Its validity is assumed or taken for granted. The learned counsel has cited no authority to shake the principle of construction adopted in the former judgment, and I feel safe in re-affirming it, as therein expressed.

I would close my remarks here were it not that I feel compelled by a sense of duty to myself, to notice the correspondence on this subject which appears to have taken place between the Minister of Foreign Relations and the Representatives of the three great Powers resident near this Government, shortly after the rendition of the judgment now under review, which correspondence has now been brought to the cognizance of the court. Waiving any lengthy comment upon what I must regard as being, under the circumstances, a strange proceeding on the part of the Minister of Foreign Relations, inasmuch as the suit was still pending before this court, I must say that the Minister appears to have greatly misunderstood my judgment, when he wrote to the Representatives of Great Britain and France, that "Some of the King's Judges had found the 7th article of the treaty with Denmark, of the 19th October, 1846, altogether unintelligible, as regards what other foreign ships could or could not do at that time, and as regards what duties the goods of the most favored nation, when imported into this kingdom, were at that time subjected to." So, also, he sadly misunderstood that judgment, when, after he had received the two conflicting opinions of the Representatives above mentioned, he wrote to the Commissioner of the United States, assuring him first that he believed him to be, "*not only a good Diplomatist, but an able and sound Lawyer,*" and soliciting his opinion on the subject, stating to him that, "The 7th article of the Danish treaty, in the clearest and plainest possible terms, puts Danish productions or other goods imported in Danish vessels on a *par*, with those of the most favored nation," gravely informed the Commissioner that, "The King's Judges have had a difficulty in comprehending how that simple rule of parity is to be applied." This language, to say the least, seems very uncourteous. I found no difficulty in understanding the language used in the English version of the 7th article of the Danish treaty, or in comprehending how the simple rule of parity was to be applied, between goods imported in Danish ships and the "goods of the most favored nation," as the article reads. The difficulty was that I could find no justification either for interpolating the text, which must be done to give it the meaning contended for by the Minister, or for applying extraneous means to explain, or rules to interpret, what I found to be in itself so clear and plain as the language of that article; for, as I stated in my judgment, to interpret it in that manner, appeared to me a violation of the first principle of interpretation, as laid down by one of the best authorities on international law.

The correspondence referred to would seem to betray an intention on the part of the Minister to break down my decision, not by a fair

appeal to the full court, but by a re-assertion of his own understanding of the treaty, and a zealous *ex parte* effort to procure and enlist in favor of his view the opinions of outside parties. Whatever degree of weight opinions procured in that manner may possess with others, they have none whatever in my estimation, so far as the proper construction of the English version of the Danish treaty is concerned.

For my part, while I humbly disclaim all pretentions to infallibility in judgment, I must at all times require, what I have now obtained in this case, a far more satisfactory reason for changing an opinion formed upon due deliberation, than the mere fact, that a contrary opinion has been dogmatically asserted and reiterated by any man whomsoever.

Mr. Montgomery for plaintiff.

Mr Bates for defendant.